FILED

2018 Oct-17  PM 01:39
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF ALABAMA

# SOUTHERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **vs.** | ) | **Case 2:17-cr-00419-AKK-TMP** |
| | ) | |
| **DAVID LYNN ROBERSON** | ) | |

## <u>UNITED STATES' SENTENCING MEMORANDUM</u>

## Table of Contents

THE CRIMES ...................................................................................................2

THE DEFENDANT'S OBJECTIONS TO THE PSR ............................................11

A.    Offense Conduct.........................................................................................11

B.    Loss Amount ...............................................................................................25

C.    Victim Impact..............................................................................................29

D.    Role in the Offense .....................................................................................32

APPLICATION OF THE SECTION 3553(a) FACTORS .....................................35

A.    The PSR Correctly Calculates the Guidelines Range ....................................35

B.    The Recommended Sentence is Fair and Reasonable....................................36

C.    Departure Due to Family Circumstance and Mental Health ..........................39

CONCLUSION .................................................................................................41

CERTIFICATE OF SERVICE ............................................................................42

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **vs.** | ) | **2:17-cr-00419-AKK-TMP** |
| | ) | |
| **DAVID LYNN ROBERSON** | ) | |

## UNITED STATES' SENTENCING MEMORANDUM

Comes now the United States of America, by and through Jay E. Town, United States Attorney for the Northern District of Alabama, and respectfully submits the following sentencing recommendation for David Lynn Roberson, a corporate executive who, together with his company's lawyer, callously and selfishly bribed a state legislator with a $375,000.00 consulting contract to betray his constituents and neighbors in North Birmingham and Tarrant and exclusively represent the interests of Drummond Company. The defendants' conduct harmed the residents of North Birmingham and Tarrant, and brought shame on Drummond and Balch & Bingham.

1

The United States recommends that the Court sentence Roberson to 78 months imprisonment, impose a fine of $250,000.00, and order Roberson to serve three years of supervised release following imprisonment. As a special condition of supervised release, the government requests that the defendant be required to perform 250 hours of community service in the North Birmingham community annually. The recommended sentence fairly reflects Roberson's crimes, restitution to the communities, his lack of remorse, and sends the appropriate messages of deterrence.

## THE CRIMES

The evidence presented at trial proved that Gilbert and Roberson conspired to bribe state representative Oliver Robinson with a consulting contract to reward him for using his office to support the defendants' position opposing the EPA's actions involving expansion and prioritization of a Superfund site near Robinson's legislative district. The evidence established that over a two-year period, the defendants paid Robinson approximately $375,000 under the contract. In return, Robinson, among other actions, took a variety of official acts to support the defendants' agenda. Robinson advocated for the defendants' positions in a meeting with the EPA, using talking points drafted by Gilbert and secretly recording the meeting; he made comments to the Alabama Environmental Management Commission (AEMC) urging them and the Director of the Alabama Department of

Environmental Management (ADEM) to be more involved in North Birmingham and to help narrow the list of parties potentially responsible for the Superfund site cleanup; and he voted in the Alabama House of Representatives Rules Committee on a resolution, drafted by Gilbert, opposing the EPA's efforts in North Birmingham. In performing each of these official acts, Robinson concealed his financial relationship with Balch and Drummond, as the defendants and their contract required him to do.

The evidence established that, at all relevant times, two matters were pending before the EPA that directly implicated the defendants and their interests. First, in July 2014, the EPA began considering a petition to expand the 35th Avenue Superfund Site. Also, in September 2014, the EPA proposed adding the Superfund Site to the National Priorities List. Evidence presented at trial proved the defendants' determination to influence ADEM's position regarding these issues. The EPA's and ADEM's consideration of these proposed actions, and the defendants' interest in opposing EPA and influencing ADEM, continued into 2016.

The defendants had an interest in ensuring that the EPA decided against both actions. Roberson worked as a lobbyist at Drummond Company, and the EPA had identified ABC Coke, a division of Drummond, as one company potentially responsible for the pollution in North Birmingham. Drummond could potentially be

held liable for tens of millions of dollars in cleanup costs and fines. Drummond hired Balch and Bingham ("Balch") to represent Drummond in opposing the EPA's actions. Gilbert was the partner at Balch primarily representing Drummond in responding to the EPA's actions in North Birmingham; he was awarded substantial increases in compensation and partnership stake based largely on the significant attorney's fees collected from Drummond.

The evidence further proved that, as part of their strategy, Roberson exploited his relationship with Oliver Robinson and brought Robinson into the scheme. The defendants paid Representative Robinson to take, among other actions, official action favorable to the defendants' interests in matters related to EPA's efforts in North Birmingham. Beginning in November 2014, the defendants discussed entering into a contract with one of Robinson's entities. Gilbert later (in February 2015) drafted and signed the contract with Robinson's foundation, and ensured that Balch invoices were sent to Roberson at Drummond to facilitate reimbursement for Balch's payments to Robinson. The defendants' payment scheme was designed to hide Drummond's funding of payments to Oliver Robinson's foundation; it worked differently than the manner in which payments were made to SE&C, the other consultant hired by Balch and Drummond on this project. SE&C billed, and was paid by, Drummond directly.

4

Emails introduced into evidence at trial proved that on December 11, 2014, Robinson told Gilbert that "we will need $7000 per month," and that payments should go "to the Oliver Robinson Foundation. It was decided the Foundation is best because all types of corps support [Robinson's] foundation." Oliver Robinson also reminded Gilbert that he was scheduled to meet with the Regional Administrator for EPA Region 4 the following day. A few hours later, Gilbert informed Robinson that Drummond had approved his request. Balch billing records revealed that Gilbert spoke with Roberson about approval for Robinson's request for $7,000 per month. The next day Robinson met with and advised EPA officials on the issues related to North Birmingham. In preparation for that meeting, Gilbert gave Robinson a list of talking points consistent with the defendants' position and Robinson secretly recorded the meeting, delivering the recording to Gilbert immediately following the meeting.

In early February 2015, Gilbert and Roberson met to discuss the upcoming AEMC meeting they wanted Robinson to attend. Roberson initially approached Robinson about making comments to AEMC in response to GASP's earlier presentation. Roberson lied to the FBI when he minimized his knowledge of and participation in Robinson's AEMC appearance. Gilbert and his associate drafted a letter for Robinson's signature requesting permission to speak at the AEMC meeting.

Gilbert specifically added the phrase "as a state legislator" to the letter to make it clear that Robinson would be appearing at AEMC in his official capacity. Gilbert lied to the Grand Jury and trial jury about his intent that Robinson use his office in this manner. Robinson printed the letter on his official letterhead, signed it, and sent it to the AEMC Chairman. The letter included this sentence, drafted by Gilbert: "As a state legislator and representative of a district adjacent to the North Birmingham superfund site, it is my duty to ensure that the North Birmingham community is adequately represented to relevant State organizations such as AEMC."

On February 6, 2015, the day he signed the letter, Robinson expressed reluctance to Gilbert about speaking to the AEMC. Robinson's reluctance was proven by his testimony, the testimony of Balch attorney Irving Jones, and by Gilbert's email to Roberson informing him that Robinson was having second thoughts and that "[Robinson] needed to think about the politics of it before he would commit to providing comments to the AEMC." Gilbert asked Roberson to "follow[] up with [Robinson] on this issue." In the two weeks between February 6th and the AEMC meeting on February 20th, Gilbert had conference calls and meetings with Roberson "regarding AEMC," "regarding Mr. Oliver Robinson's activities," and "various calls with Messrs. Oliver Robinson and David Roberson regarding finalization of engagement agreement and payment." Also, the defendants held a

meeting with Robinson to prepare him for his AEMC comments. The defendants convinced Oliver Robinson to appear at the AEMC meeting, despite his reluctance, with words, money, and a contract.

Gilbert finalized the contract between Balch and Robinson, requested that Balch's accounting department quickly write a $14,000 check to the Foundation, and invoiced Roberson at Drummond for the same amount. Roberson ensured a check was immediately delivered to Balch for $14,000 to fund the payment to Oliver Robinson's foundation. Gilbert gave Robinson the $14,000 check, and Gilbert and Robinson executed the contract, which mandated that even its "existence" be kept "confidential" by Robinson.

Four days after execution of the contract and delivery of the $14,000 check, Robinson appeared at the AEMC meeting. A video recording presented at trial established that Robinson advised the AEMC and ADEM Director to take and maintain a position on behalf of the State of Alabama favorable to the defendants' interests on the two proposed EPA actions. At the AEMC meeting, Robinson stated that the AEMC should help narrow the list of potentially responsible parties if no reports or tests implicated them. The defendants' general intent in sending Robinson to speak before the AEMC was to get ADEM more involved in the North Birmingham issues. As Gilbert confirmed during his testimony, ADEM was an

important state agency, the defendants were not pleased with ADEM's response to the EPA, and they wanted ADEM to more aggressively assert the State's appeal rights.

A few months later, Gilbert wrote a Joint Resolution for consideration by the Alabama Legislature urging "the Attorney General and ADEM to combat the EPA's overreach." Roberson admitted to the FBI that he was involved with SJR-97, and Drummond paid Balch legal fees under the 35th Avenue Superfund Site matter for drafting the resolution. The defendants sent the draft resolution forward, knowing it would be introduced in the legislature and that Robinson would have a vote at a time when Robinson was on retainer to Balch to act in Balch's interests exclusively in relation to the environmental issues pending in North Birmingham. Robinson voted in the House Rules Committee to send the resolution to the floor of the House with the recommendation that the resolution be adopted. The defendants cited the joint resolution in correspondence sent to public officials and others enlisting support for Drummond's position.

The defendants' strategy included influencing other public officials to adopt Drummond's position opposing EPA's actions in North Birmingham and Tarrant. Gilbert, with Roberson's approval, wrote numerous letters for public officials, including the Alabama Governor and Attorney General, and every member of the

federal legislative delegation from Alabama except Representative Terri Sewell. Moreover, the defendants met with representatives of the Governor's and Attorney General's offices. When ADEM Director Lance LeFleur proved unresponsive to the defendants' entreaties, the defendants convinced the Governor to apply pressure on LeFleur.

In mid-2015, in an effort to conceal the arrangement among Balch, Drummond, and the Oliver Robinson Foundation, Gilbert instructed Balch's accounting department to remove references to the Foundation on its past invoices to Drummond and to avoid similar references on future invoices. According to Gilbert, his directive regarding the invoices was motivated by a request from Drummond.  Roberson was the primary contact at Drummond for the Robinson contract and payments, and Gilbert sent the consulting invoices related to Oliver Robinson directly to Roberson. These invoices were handled differently than the other invoices from Balch, which were sent directly to Drummond's General Counsel.

The defendants formed the Alliance for Jobs and the Economy ("AJE") to supplement Drummond's funding of payments to Robinson. Roberson controlled AJE's bank account and decided which entity – Drummond or AJE – would reimburse Balch for the payments to Oliver Robinson's foundation. The defendants

concealed from AJE members that Oliver Robinson's foundation was involved in community outreach and that all their contributions were being used to pay Robinson.

Through GetSmart Tarrant, the Oliver Robinson Foundation performed some community outreach work in Tarrant beginning in October 2015, after Amanda Robinson was hired. Gilbert admitted that the community outreach work began with GetSmart. The only work arguably characterized as community outreach prior to the GetSmart campaign in the Fall 2015 was John Powe's collection of signatures on Gilbert's "dumbed down" community letters, for which Powe was paid $1,000. Between December 2014 and September 2015, when his only actions were the official ones involving the illegal use of his office, Robinson was paid $49,000. In fact, on February 25, 2015, following Representative Robinson's appearance at the AEMC, Gilbert and Roberson met with Trey Glenn and Scott Phillips from SE&C regarding their "community outreach strategy." Neither defendant informed them that Robinson was a paid consultant working on community outreach during discussions about the participants on their community outreach team and the strategy going forward.

## THE DEFENDANT'S OBJECTIONS TO THE PSR

The defendant submitted 35 objections to the "Offense Conduct" section of the PSR, objected to the calculation of the loss amount, asserted that his crimes were victimless, and indicated that he would request a reduction in the offense level for mitigating role. Doc. 292. The United States submits the following response to each of these objections.

### A.   Offense Conduct

The Offense Conduct section of the PSR is the Probation Officer's attempt to summarize the defendant's criminal conduct. However, because she was not present during the four week trial and did not have the benefit of the trial transcript, her rendition of the facts is not a complete statement of the evidence proving the defendant's guilt. It is, however, a substantially accurate summary. The testimony and exhibits admitted during trial fully prove the defendant's crimes. By not objecting to the PSR, the United States is not conceding, for purposes of appellate review, that the PSR's version of the defendant's offense conduct is a complete statement of the evidence supporting the jury's verdicts.

In response to the defendant's objections, the Probation Officer made revisions to the PSR that are inaccurate. In Paragraph 22, the Probation Officer

deleted the reference to Oliver Robinson's attempt to pressure and advise the AEMC consistent with the defendants' position. Addendum at 3 (deleting "pressure and advise"). The Indictment charged and evidence proved that the defendants intended that Robinson provide advice to the AEMC. In response to the defendant's objection to Paragraph 25, the Probation Officer changed the date of the defendants' discussion with Oliver Robinson regarding submission of a proposal from November 2014, which was accurate, to December 2014.

1.     Oliver Robinson testified that he had a professional relationship with the defendant. Tr. at 1687, 2008-09. He stated that he knew Roberson as a lobbyist for Drummond Company and that, for a couple of years, they had lunch together following the legislative session. Tr. at 1688. It was during the 2014 annual lunch that Roberson first approached Oliver Robinson about helping Balch and Drummond. Tr. at 1687. Roberson agreed that his relationship with Robinson was a "professional friendship" and acknowledged their lunch dates. Tr. at 3474-75. He stated that he thought Oliver Robinson was "an impressive guy." Tr. at 3474. The PSR at paragraph 12 is accurate.

2.     The United States has no objection to the addition of the word "potential" before pollutants in paragraph 16 insofar as it relates to the GASP petition and preliminary assessment of pollution in Tarrant.

12

3.   Generally speaking, the broad plan opposing EPA was initiated by Drummond and Balch. The illegal part of that plan (i.e.; the conspiracy) involving bribery of Oliver Robinson was initiated by Gilbert and Roberson. One goal of both Balch's legal representation of Drummond and the defendants' bribery conspiracy was to protect ABC Coke and Drummond. The PSR at paragraph 20 is not inaccurate.

4.   It is undisputed that the Balch checks were made payable to the Oliver Robinson Foundation and deposited into the Foundation's account, which Robinson controlled. The payments to the Oliver Robinson Foundation were the means by which the defendants agreed to pay Robinson for using his office on their behalf. The evidence at trial also proved that Oliver Robinson was paid out of the proceeds of those checks. The PSR is correct in paragraph 20 when it states that Oliver Robinson was paid through the Foundation.

5.   The defendant's objection to the portion of paragraph 20 stating that the contract memorialized a lawful community outreach program ignores the jury's verdict and substantial evidence that the contract was given as an illegal bribe. That the defendant's rejected theory was different from the evidence and the PSR's assertion that Balch improperly paid Oliver Robinson to represent its client's interests exclusively does not render the PSR inaccurate. Also, the language of the

13

contract does not describe a community outreach program. It instead memorializes a broader relationship involving consultation on "environmental, regulatory, and political matters." GX 2.

6.      Harkening back to his curious statement during trial that the potential costs to Drummond if it were found liable for pollution in North Birmingham and Tarrant would only be equivalent to "a rounding error," Tr. at 2059, Roberson's counsel asserts that the PSR is inaccurate in paragraph 20 when it describes those costs as "tremendous." The evidence proved that the costs to any responsible party would have been many tens of millions of dollars. To most privately-held companies, those potential costs would be tremendous, whether the company could shoulder the burden or not. Mike Tracy, Drummond's CEO, used a different adjective in describing the costs when he said that being held responsible could have a "significant" economic impact on Drummond. Tr. at 1465-66. Gilbert testified in Grand Jury that the EPA's actions in North Birmingham were important to the potentially responsible parties because of the potential costs associated with being held responsible for the cleanup, including the $42 million the EPA had spent as of that time and treble damages. Tr. at 3287-89. Whatever the defendant's preferred adjective, the PSR is not inaccurate.

14

7. The United States has no objection to the addition of the word "potential" before pollutants in paragraph 20 insofar as it relates to the GASP petition and preliminary assessment of pollution in Tarrant.

8. In paragraph 21, the PSR is conveying the proven fact that the idea for AJE originated with Gilbert and Roberson. It is true that the defendants enlisted Balch attorney Linberry to perform the technicalities of formally establishing it as a legal entity in Delaware.

9. The PSR correctly states in paragraph 21 that the defendants concealed from the members of AJE that all of their contributions were being used to fund payments to the Oliver Robinson Foundation. The evidence proved overwhelmingly that the defendants did not tell any member of AJE that their money was being used to pay Oliver Robinson's foundation or that Robinson had been asked to perform the official acts. Steve Messier of Nucor Steel, Mike Thompson of Thompson Tractor, and Van Richey of ACIPCO each testified that the defendants never told them that their contributions were being funneled to Oliver Robinson's foundation. Tr. at 1212, 1218 (Messier); Tr. at 1264-65, 1286, 1314 (Thompson); Tr. at 1340-41, 1346, 1378-79 (Richey). Gilbert lied about what information he shared with these CEOs during his trial testimony. Tr. at 4043. That, in December 2015, months after the companies joined AJE, Roberson buried one Oliver Robinson Foundation invoice to

15

Balch in the middle of a lengthy email attachment containing Balch invoices to AJE is a mistake, not transparency. Neither of the CEOs who received that email testified that they read the lone invoice. Tr. at 1287 (Thompson); 1362-63 (Richey). The other invoices were the Balch invoices from which the defendants had deleted references to Oliver Robinson.

10.     Paragraph 22 of the PSR should not be amended as the defendant suggests. The payments to the Oliver Robinson Foundation were the means by which the defendants agreed to pay Robinson for using his office on their behalf. The evidence proved that defendant Roberson was part of the conspiracy and, specifically, the decision to pay Robinson's foundation $7,000, then $20,000, per month. Because the PSR does not state that the defendant knew that Robinson was personally receiving money, the defendant's objection is superfluous in that regard.

11.     The government agrees with the defendant's objection to paragraph 22's statement that the defendants intended for Oliver Robinson to pressure EPA officials. However, Roberson's assertion that Oliver Robinson was merely expressing support for a policy position is merely a restatement of the defendants' rejected interpretation of the evidence.

12.     The defendant's objection to paragraph 22's statement regarding expansion of the superfund site into Tarrant is factually incorrect. Oliver Robinson's statement to the AEMC included this statement: "I'm here today because of the 35th Avenue North Superfund Site. And there have been petitions provided to the Environmental Protection Agency to have the City of Tarrant and Inglenook designated as Superfund sites." GX 69.

13.     The defendant's objection to the portion of paragraph 22 stating that the contract memorialized a lawful community outreach program ignores the jury's verdict and substantial evidence that the contract was given as an illegal bribe. That the defendant's rejected theory was different from the evidence and the PSR's assertion that Balch improperly paid Oliver Robinson to represent its client's interests exclusively does not render the PSR inaccurate. Also, the language of the contract does not describe a community outreach program. It instead memorializes a broader relationship involving consultation on "environmental, regulatory, and political matters." GX 2.

14.     The defendant's objection to the portion of paragraph 23 stating that the contract memorialized a lawful community outreach program ignores the jury's verdict and substantial evidence that the contract was given as an illegal bribe. That the defendant's rejected theory was different from the evidence and the PSR's

17

assertion that Balch improperly paid Oliver Robinson to represent its client's interests exclusively does not render the PSR inaccurate. Also, the language of the contract does not describe a community outreach program. It instead memorializes a broader relationship involving consultation on "environmental, regulatory, and political matters." GX 2.

15.     The undisputed evidence proved that the Balch invoices related to the Oliver Robinson Foundation were addressed and sent to defendant Roberson, GX 101-122; Tr. at 3481, who then decided whether Drummond or AJE would reimburse Balch, Tr. at 1165-66. Only Roberson's approval was necessary to commit AJE funds, GX 124; Tr. at 1159-61, and Roberson initiated the required process within Drummond if he decided Drummond funds would be used to pay the Balch invoices, Tr. at 1167-68. The PSR is correct when it states in paragraph 23 that Roberson caused either Drummond or AJE to remit payment to Balch.

16.     The defendant's objection to the statement in paragraph 23 that "the payment scheme was designed to hide Drummond's funding of payments to the Oliver Robinson Foundation" is consistent with the evidence. The Balch invoices were edited to delete references to Oliver Robinson at the request of Drummond. GX 5; Tr. at 3946. And Drummond paid their other consultant on the project, SE&C, directly, GX 128, but paid the elected official indirectly. Moreover, Roberson's own

statement was that the payment scheme was intended to distance the companies from Oliver Robinson. Tr. at 3479-80.

17.     Paragraph 23 does not state that Roberson knew the contents of the contract, but the defendant objects anyway. In any event, there is evidence that Gilbert and Roberson discussed the contract, GX 129 at 326, and it is logical to infer that the attorney provided his client with a copy of the contract. In fact, although not an exhibit offered during trial, Roberson provided the Grand Jury a copy of the executed contract in response to a subpoena to AJE marked with the AJE bates-stamp.

18.     The government agrees that paragraph 25 should be edited to reflect that the discussions about sending Oliver Robinson to the AEMC meeting began after November 2014. Roberson was involved in recruiting Oliver Robinson to go to the AEMC. Oliver Robinson testified that it was Roberson who spoke with him initially about appearing at the AEMC meeting to respond to GASP's presentation. Tr. at 1726.

19.     Roberson's assertion that Oliver Robinson was merely expressing support for a policy position and not "advising" AEMC is merely a restatement of

the defendants' rejected interpretation of the evidence. Paragraph 25 of the PSR is correct in this regard.

20.     The email referenced in paragraph 26 of the PSR was admitted into evidence as GX 14 in its entirety.

21.     The discussion points referenced in paragraph 27 of the PSR were written by Gilbert for Oliver Robinson's use during the meeting with EPA officials and were consistent with Balch's and Drummond's position on North Birmingham and Tarrant. GX 17 and 18. Gilbert included questions designed to subtlety communicate the defendants' position, including questioning why EPA needed to bring in other companies when Walter Coke had admitted responsibility and that doing so would only result in protracted litigation. These positions were also consistent with Robinson's presentation to the AEMC. The PSR need not be amended.

22.     The PSR does not state that Gilbert "improperly" obtained the GASP presentation. Gilbert did utilize his relationship with his paid consultants, former ADEM director Trey Glenn and AEMC member Scott Phillips, to obtain the presentation and relay his talking points to the AEMC. GX 20 and 21.

23.     The defendant's objection to the portion of paragraph 27 stating that the contract memorialized a lawful community outreach program ignores the jury's verdict and substantial evidence that the contract was given as an illegal bribe. That the defendant's rejected theory was different from the evidence does not render the PSR inaccurate. Also, the language of the contract does not describe a community outreach program. It instead memorializes a broader relationship involving consultation on "environmental, regulatory, and political matters." GX 2.

24.     The PSR's summary of the GASP presentation to the AEMC is accurate. The entire presentation was admitted into evidence as GX 24. Oliver Robinson's meeting with GASP was charged and proven to be an overt act in furtherance of the conspiracy; it also served as evidence of the defendants' motive and corrupt intent. It is proper for the PSR to mention that evidence as it does in paragraphs 27 and 28.

25.     The evidence proved that Oliver Robinson secretly recorded his meetings with EPA and GASP and immediately provided those recordings to Gilbert.

26.     Paragraph 30 of the PSR accurately quotes the email from Gilbert to Roberson regarding Oliver Robinson's reluctance to appear before the AEMC and Gilbert's request that Roberson follow up with Robinson. GX 42.

27.     The government agrees that the $14,000 check referenced in paragraph 31 of the PSR was made payable to the Oliver Robinson Foundation. GX 4.

28.     Paragraph 32 does not state that Roberson knew the contents of the contract, but the defendant objects anyway. In any event, there is evidence that Gilbert and Roberson discussed the contract, GX 129 at 326, and it is logical to infer that the attorney provided his client with a copy of the contract. In fact, although not an exhibit offered during trial, Roberson provided the Grand Jury a copy of the executed contract in response to a subpoena to AJE marked with the AJE bates-stamp.

29.     The PSR should reflect in paragraph 33 that there was an agreement among the conspirators that Oliver Robinson would meet with two members of the AEMC prior to the meeting of the full Commission. The defendant is incorrect when he states that there is no evidence that he participated in such an agreement. Oliver Robinson testified that Roberson participated in a meeting at Balch with Gilbert and

Trey Glenn to discuss, among other issues, a meeting with Lanier Brown prior to the AEMC meeting. Tr. at 1738-39, 1744.

30.    The PSR at paragraph 34 accurately summarizes Oliver Robinson's comments at the AEMC meeting. His full comments were admitted into evidence. GX 67 and 69.

31.    The defendant's objection to the portion of paragraph 35 stating that the contract memorialized a lawful community outreach program ignores the jury's verdict and substantial evidence that the contract was given as an illegal bribe. That the defendant's rejected theory was different from the evidence does not render the PSR inaccurate. Also, the language of the contract does not describe a community outreach program. It instead memorializes a broader relationship involving consultation on "environmental, regulatory, and political matters." GX 2.

32.    Paragraph 36 of the PSR need not be amended because it accurately reflects the evidence proving that Gilbert drafted the joint resolution that was intended to be submitted to the legislature. At the very least, the evidence proved that Gilbert edited the resolution later knowing it would be submitted for consideration by the legislature shortly thereafter. Tr. at 3927-28.

33.     The defendant's objection to the portion of paragraph 36 stating that the contract memorialized a lawful community outreach program ignores the jury's verdict and substantial evidence that the contract was given as an illegal bribe. Moreover, Oliver Robinson testified that he was bribed, Tr. at 2031, and that the contract was given to him in connection with the use of his elected office for the defendants, Tr. at 1670. That the defendant's rejected theory was different from the evidence does not render the PSR inaccurate. Also, the language of the contract does not describe a community outreach program. It instead memorializes a broader relationship involving consultation on "environmental, regulatory, and political matters." GX 2. The contract was with the Foundation, as the defendant states, but it was Robinson the legislator that the defendants retained to perform official acts as they required. The contract with his foundation was the bribe and his reward.

34.     The PSR correctly states in paragraph 34 that, as he confirmed during his testimony, Oliver Robinson voted in the Rules Committee to send the defendants' joint resolution to the full House of Representatives. Tr. at 1772-73. Although the defendant posits an objection, the PSR does not state that Robinson voted on the resolution on the floor of the House.

35.    The government suggests that paragraph 38 of the PSR be amended to indicate that "the Oliver Robinson Foundation communicated" rather than "Robinson, through other individuals, communicated."

## B.    **Loss Amount**

The loss amount is $119,000.00, the amount Oliver Robinson received from Balch's payments to the Foundation under the contract given as the bribe. *See* U.S.S.G. § 2C1.1(b)(2)(referring to the "value of the payment" and the "value of anything obtained or to be obtained by the public official" as determining factors of loss). This amount includes money paid to the Oliver Robinson Foundation during the duration of the tainted contract minus the amounts paid to others who worked for the Foundation performing community outreach and expenses. The evidence produced at trial, including the Balch checks and Oliver Robinson Foundation invoices, supports this loss amount and allows the Court to make a reasonable estimate of loss. *See* U.S.S.G. § 2B1.1, comment. (n.3(C)) ("The court need only make a reasonable estimate of the loss.").

The Oliver Robinson Foundation invoices, admitted into evidence collectively as GX 93, show that, prior to the creation of GetSmart in October 2015, when community outreach began, the Foundation sent Balch six invoices totaling

$49,000.00. Oliver Robinson paid $1,000.00 to John Powe for obtaining signatures on Gilbert's dumb-downed letters, GX 283, leaving $48,000.00 for Robinson. Beginning in October 2015 and continuing until December 2015, the Foundation sent Balch twenty five invoices that included a $2,500.00 charge for Oliver Robinson as a program lead (total of $62,500.00) and one invoice that included a $1,500.00 charge for Robinson as a program lead. GX 93. Balch paid each of these invoices, as evidenced by their checks to the Foundation that were admitted collectively into evidence as GX 94. Therefore, the value of the payments to Oliver Robinson is calculated as follows: $48,000.00 + $62,500.00 + $1,500.00 = $119,000.00. The remainder of the money paid by Balch and Drummond to the Foundation was used to pay administrative costs and employees of GetSmart, including Amanda Robinson, John Powe, and Hezekiah Jackson. GX 93.

Oliver Robinson admitted that the loss amount was $123,000.00, and the Court used that loss amount in sentencing him for this same scheme. Oliver Robinson also agreed as part of his plea and sentencing that he would (and he did) personally pay taxes on *all* the money Balch paid to the Foundation.

The defendants' objections to the calculation of the loss amount are unfounded. First, the loss amount correctly reflects that Oliver Robinson received benefits from the contract until at least December 2016. The invoices from the

Foundation to Balch, GX 93, and the checks from Balch to the Foundation, GX 94, prove the time frame of the payments. Gilbert's attempt to limit the time frame of the conspiracy by citing the government's summary exhibit, GX 260, mischaracterizes the purpose of that evidence. The summary exhibit was offered to show the lack of community outreach work by Oliver Robinson and John Powe prior to GetSmart and not, as the defendant argues, to prove the relevant parameters of the bribery conspiracy.

The amount received personally by Oliver Robinson is considered loss whether he performed work or not. *See* U.S.S.G. § 2C1.1(b)(2)(referring to the "value of the payment" and the "value of anything obtained or to be obtained by the public official"). Nevertheless, the evidence, including the defendants' own admissions, proved that Robinson did little work under the contract. Gilbert admits in his objection that the evidence demonstrated that he barely dealt with Oliver Robinson after Fall 2015. Doc. 293, *Sharman Letter*, October 2, 2018, at 3. Gilbert testified during trial that "I'm not sure of any work he did do." Tr. at 3926. In Grand Jury, when asked about Oliver Robinson's role under the contract, Gilbert testified that "He really didn't have any." Tr. at 3264. Defendant Roberson's statement similarly reflects that "Robinson was not going to do the work," Tr. at 3481, and that "Roberson did not expect Robinson to be out in the community. He was the brains

behind it. Roberson rarely met with Robinson after the contract was established."
Tr. at 3482. Oliver Robinson's testimony was consistent with the defendants'
admissions. Robinson testified that he did not meet with the defendants often and
was not out in the neighborhoods, Tr. at 1776, and Robinson did not list himself
when naming the people at the Foundation who were performing the work, Tr. at
2035. The government's summary exhibit, cited by Gilbert as a basis for his
objection, proves that neither Robinson nor his Foundation did community outreach
prior to GetSmart. GX 260.

Gilbert also asserts that the loss amount should only include $5,000 per month
for the first seven payments to the Foundation (before GetSmart) rather than the
$7,000 Balch and Drummond actually paid to the Foundation monthly. Gilbert's sole
support for his argument is that the evidence proved Robinson received only $5,000
per month as a "program lead" after GetSmart became operational in October 2015.
Gilbert's argument is wrong. First, Oliver Robinson personally received, through his
Foundation, each of the $7,000 payments Balch made in the months prior to October
2015, except for $1,000 he paid to John Powe for procuring signatures on Gilbert's
dumb-downed letters. The evidence at trial proved there was no one else involved
with the contract at the Foundation other than Robinson and Powe (in the very
limited capacity related to the letters) prior to the hiring of Amanda Robinson to

direct GetSmart. Oliver Robinson confirmed that the $7,000 payments from Balch had very little to do with John Powe. Tr. at 2031. Second, even if the amount is only $5,000 per month, as Gilbert argues, the eight level enhancement to the offense level would not change because the loss amount would still fall within the $95,000.00 to $150,000.00 range in U.S.S.G. § 2B1.1(b)(1)(E).

### C.   <u>Victim Impact</u>

<u>Residents of North Birmingham</u>: Gilbert admits, as he must, that all citizens of Alabama, including those residing in North Birmingham, are victims of his bribery conspiracy with Oliver Robinson in the sense that corrupt politicians and their cohorts harm us all. Doc. 293, *Sharman Letter*, October 2, 2018, at 2. The conspirators' actions also victimized the residents of North Birmingham by potentially adversely affecting their health.

The defendants' broad strategy was to prevent the 35th Avenue Superfund Site from being listed on the National Priorities List, whether Drummond Company was responsible for the pollution found in the yards of North Birmingham residents or not. As part of this strategy, the defendants convinced public officials, Oliver Robinson among them, to insert themselves into the process by submitting letters and/or making comments (written by the defendant) objecting to the NPL listing.

This strategy created delay within EPA that prevented a decision within the ordinary timeframe. As Jennifer Wendel from EPA testified: "And if a site is, let's say, proposed in the spring and doesn't receive a significant amount of adverse comments, we usually then go ahead and finalize it in the next rule update, which would be in the fall. If we receive a lot of comments that are going to require a lot of work, sometimes that can be delayed." Tr. at 1589. Anne Heard, Deputy Administrator of EPA Region IV and a participant in the meeting with Oliver Robinson, for which the defendant paid Robinson a bribe, testified that she noticed (to her surprise) Robinson's pro-business slant, Tr. at 2907-08, and that the adverse opinion of a state legislator such as Robinson would "at least give me pause" and "impact my evaluation of a matter," Tr. at 2889-90.

At least in part, as a result of the conspirators' actions, including bribery of Oliver Robinson, the additional federal money that EPA could have used to clean up pollution that had been found in residents' yards was not available. *See* Tr. at 1507, 1588 (NPL listing allows EPA to access additional funding). The residents' continued exposure to pollution while EPA considered the comments of Oliver Robinson and other public officials, encouraged and written by Gilbert, carried at least the potential to adversely affect residents' health. And if the defendants' overall plan of preventing the listing of the 35th Avenue Superfund Site on the NPL had

succeeded, the additional federal money needed to finish the cleanup of polluted yards never would have been available despite the communities' and residents' obvious needs.

Alliance for Jobs and the Economy: The members of AJE were also victims of the defendants' bribery scheme because the defendants concealed from them that all of their contributions were being used to fund payments to the Oliver Robinson Foundation. The evidence proved overwhelmingly that the defendants did not tell any member of AJE that their money was being used to pay Oliver Robinson's foundation or that Robinson had been asked to perform the official acts. Steve Messier of Nucor Steel, Mike Thompson of Thompson Tractor, and Van Richey of ACIPCO each testified that the defendants never told them that their contributions were being funneled to Oliver Robinson's foundation. Tr. at 1212, 1218 (Messier); Tr. at 1264-65, 1286, 1314 (Thompson); Tr. at 1340-41, 1346, 1378-79 (Richey). Gilbert lied about what information he shared with these CEOs during his trial testimony. Tr. at 4043. That Roberson buried one Oliver Robinson Foundation invoice to Balch in the middle of a lengthy email attachment containing Balch invoices to AJE is a mistake, not transparency. Neither of the CEOs who received that email testified that they read that lone invoice, Tr. at 1287 (Thompson); 1362-

63 (Richey), and they did not know that the edited Balch invoices concealed monthly payments to the Oliver Robinson Foundation.

### D.    Role In The Offense

The defendant objects that the PSR does not decrease the offense level based on mitigating role pursuant to § 3B1.2. He asserts that he was a minor to minimal participant and should receive a two to four level decrease in the offense level. Because the defendant has failed to prove that he performed a mitigating role, his objection should be overruled.

The Sentencing Guidelines allow a decrease in the offense level if the defendant played a mitigating role in the offense. U.S.S.G. § 3B1.2.  Section 3B1.2 "provides a range of adjustments for a defendant who plays a part in committing the offense that makes him *substantially* less culpable than the average participant." *Id*. comment. (n.3(A)). The defendant bears the burden to prove the sentence should be reduced to reflect a mitigating role. *United States v. Rodroguez De Varon*, 175 F.3d 930, 939 (11th Cir. 1999)(en banc).

The evidence does not support a finding that the defendant played a mitigating role in the scheme. As the evidence at trial proved, the defendant played an integral part in the conspiracy. Understanding the scope and structure of the conspiracy, the

defendant participated in the planning and execution of the scheme and exercised decision-making authority. He is not substantially less culpable than his coconspirators.

Roberson took advantage of his professional relationship with Oliver Robinson and recruited Robinson into the scheme. Tr. at 1687, 3480. The recruitment of accomplices is usually indicative of an aggravating, not mitigating, role in an offense. U.S.S.G. § 3B1.1(b), comment. (n.4).

The defendant introduced Robinson to Gilbert, Tr. at 1691, 3868-69, and together they asked Robinson to submit a proposal, Tr. at 1693, 3479. Throughout the conspiracy, the defendant was the Drummond executive primarily responsible for interacting with Gilbert regarding the agreement with Oliver Robinson.

The defendant was involved in the planning, and/or had full knowledge, of each official act. He initially approached Robinson about speaking to the AEMC and participated in preparing Robinson for those comments. Tr. at 1671, 1726, 1738-39; GX 129. Unlike other Balch lawyers and Drummond executives, only Gilbert and Roberson knew all the facts regarding the true extent of the relationship with Robinson.

Roberson was involved in the decision, made just one day before Robinson met with EPA officials, approving the verbal agreement between Balch (not Drummond) and the Oliver Robinson Foundation. GX 14, 16. Roberson also approved the manner and amount of payments under the contract. Tr. at 3480-81, 4032-33; GX 14, 16, 51. Roberson received and approved every invoice Balch sent to Drummond and AJE seeking reimbursement for the payments to Robinson. Tr. at 3481; GX 101-122. To conceal Drummond's involvement with Oliver Robinson, the defendant, who was Drummond's contact with Balch about these invoices, instructed Gilbert to remove references to Robinson from the invoices. Tr. at 3946; GX 5. Roberson was an organizer and the President of AJE; he solely controlled its bank account. Tr. at 3478, 4041. Roberson decided which entity – Drummond or AJE – would pay an invoice. Tr. at 1165-66, 1167-68, 4035. Roberson concealed from the members of AJE that all of AJE's money was being used to fund the contract with Robinson. Tr. at 1212, 1218, 1264-65, 1286, 1314, 1340-41, 1346, 1378-79.

This was a conspiracy with no minor participants. *See United States v. Zaccardi*, 924 F.2d 201, 202-03 (11th Cir, 1991) ("It is entirely possible for conspiracies to exist in which there are no minor participants."). That a defendant may be the least culpable among the participants in a crime does not establish that

34

he performed a mitigating role in the conspiracy. *Rodriguez De Varon*, 175 F.3d at 944; *Zaccardi*, 924 F.2d at 202-03. The defendant cannot prove, as he must, that he is "substantially less culpable than the average participant." U.S.S.G. § 3B1.2 comment. (n.3(A)).

## APPLICATION OF THE SECTION 3553(a) FACTORS

### A.     The PSR Correctly Calculates the Guidelines Ranges.

Although the Guidelines are not mandatory, they remain "the starting point and the initial benchmark" in determining the appropriate sentence. *Gall v. United States*, 552 U.S. 38, 49 (2007). The Guidelines as written "reflect the fact that the Sentencing Commission examined tens of thousands of sentences" over many years in an effort to achieve the objectives of 18 U.S.C. § 3553(a). *Rita v. United States*, 551 U.S. 338, 349 (2007). The "result is a set of Guidelines that seek to embody the Section 3553(a) considerations, both in principle and in practice." *Id*. at 350. Thus, "it is fair to assume that the Guidelines, insofar as practicable, reflect a rough approximation of sentences that might achieve" those statutory objectives. *Id.*

The presentence report correctly calculates the total offense level as 26 and criminal history category as I, resulting in an advisory Sentencing Guidelines range

of 63-78 months. The United States recommends a sentence of imprisonment of 78 months.

### B.   The Recommended Sentence Is Fair and Reasonable.

Having correctly calculated the Guidelines range, the Court must impose a sentence "sufficient, but not greater than necessary, to comply with the purposes" of sentencing set forth in 18 U.S.C. § 3553(a). Under the circumstances of this case, the recommended sentence of 78 months imprisonment is fair and reasonable and would achieve the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

The recommended sentence adequately addresses the "nature and circumstances of the offense," "reflect[s] the seriousness of the offense," "promote[s] respect for the law," and "provide[s] just punishment for the offense." 18 U.S.C. § 3553(a)(1) and (2)(A). The defendants' crimes undoubtedly were serious and impacted many. Short of some act of violence, the defendants could not have asked Oliver Robinson to commit a more egregious crime than selling his elected office. The defendants' serious crimes deserve serious punishment.

Corruption of an elected official harms us all. As explained above, residents of North Birmingham were victimized in more than the usual ways as a result of this particular bribery scheme. The defendants' illegal conduct also inflicted lasting

36

damage on our government as an institution, further eroding already waning confidence in our elected officials. The defendants' scheme also damaged Drummond Company, to whom Roberson owed a duty of loyalty. Roberson betrayed every Drummond employee by seeking to advance Drummond's interests through illegal means. The dregs of his crimes have apparently caused Drummond to expend millions in legal fees defending itself, responding to subpoenas, and funding Roberson's criminal defense, an amount, according to the defendants' attorney, "far in excess of Mr. Roberson's assets and any present or future income". Doc. 292, Exhibit A at 8.

These crimes were conceived and set in motion by Roberson and Gilbert. There would have been no bribery scheme if the defendants had not offered the bribe to Robinson. Without regard for Oliver Robinson's constituents or the people of North Birmingham and Tarrant, the defendants tempted Oliver Robinson by offering an enticement to sell his office and betray the trust of his community. As detailed earlier, Roberson played a key role in recruiting Robinson and throughout the scheme.

Under the circumstances of this case, the recommended sentence will justly punish Roberson for his participation in these serious offenses and thereby promote respect for the law.

The recommended sentence will also "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B). That a corporate executive/lobbyist who conspired with his lawyer and used company money to buy a politician will serve significant time in prison for his crimes sends the appropriate message of deterrence. Other corporate executives and lobbyists surely will heed the sentence and be reminded of the consequences of bribery. The sentence imposed in this case should communicate that paying elected officials to influence and reward the use of their office is not an acceptable business practice. It is especially important that this message be communicated to potential bribe payers sitting in executive suites at corporations and law firm offices who believe bribes can be masked as consulting contracts. The greater term of imprisonment recommended for Roberson (as compared to the sentence imposed on Oliver Robinson) also rightly communicates that early acceptance of responsibility, genuine remorse for criminal conduct, and truthful cooperation with government investigations of public officials and those with whom they conspire will be duly rewarded.

The recommended sentence also avoids "unwarranted sentence disparities among defendants." 18 U.S.C. § 3553(a)(6). Roberson's sentence should be significantly greater than Oliver Robinson's sentence because Robinson accepted responsibility, pleaded guilty, and provided timely, substantial, and truthful

cooperation. Roberson lied to the FBI and did not accept responsibility or cooperate. But Roberson's sentence should be less than Gilbert's in recognition of Gilbert's false testimony during trial.

### C.     Departure Due to Family Circumstances and Mental Health

The defendant states in his objections that he intends to request a departure or variance based on his relationship with and care of his son. Doc. 292, Exhibit A at 10-11. "Family ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted." U.S.S.G. § 5H1.6. *See United States v. Allen*, 87 F.3d 1224, 1225-26 (11th Cir. 1996) (defendant's responsibility for caring for her father who suffered from Alzheimer's and Parkinson's disease did not justify departure); *United States v. Cacho*, 951 F.2d 308, 311 (11th Cir. 1992) (defendant's care of four small children did not justify departure). Family responsibilities may be relevant only if present to an *exceptional* degree. *See* U.S.S.G. § 5K2.0(a)(4), p.s. (certain offender characteristics, including family ties and responsibilities, are not ordinarily relevant in determining whether a departure is warranted unless present to an exceptional degree). A departure based on the loss of caretaking and financial support requires the presence of four additional factors, including (i) a *substantial*, *direct*, and *specific* loss of *essential* caretaking or financial support; (ii) the loss of caretaking or financial support *substantially* exceeding the ordinary harm incident

to incarceration; (iii) the absence of effective alternatives; and (iv) effectiveness of the departure in addressing the loss of support. U.S.S.G. § 5H1.6, comment. (note (B)).

The defendant may have a close relationship with his 17 year old son. However, despite the son's issues, he lives apart from the defendant in the defendant's beach house while attending meteorology school at Florida State University's campus in Panama City, Florida. PSR at ¶¶ 69 and 85. There does not appear to be a substantial, direct, and specific loss of essential caretaking or financial support that substantially exceeds the ordinary harm incident to incarceration and that is present to an exceptional degree.

The defendant asserts that he is "situationally depressed" due to his conviction, and that he is drinking more and sleeping less, conditions that likely are common among first time white-collar offenders facing incarceration. In the revised PSR, the Probation Officer quotes from a report prepared by a Dr. Mills, whose bias towards the defendant is shown in his uninformed statement that the defendant was "wrongfully convicted." PSR at ¶ 77. Even so, the doctor stops short of diagnosing the defendant with a mental disease, apparently determining that the defendant's situational depression does not require medication or treatment. Mental and emotional conditions may be relevant in determining whether a departure is

40

warranted only if such conditions are present to an unusual degree and distinguish the case from the typical cases. U.S.S.G. § 5H1.3, p.s. The defendant has not shown that his emotional health is unusual or distinguished from the typical case. Whatever emotional issues the defendant may bear can be addressed by the professionals within the Bureau of Prisons.

## CONCLUSION

WHEREFORE, the United States respectfully requests that the Court sentence Roberson to 78 months imprisonment, impose a fine of $250,000.00, and order Roberson to serve three years of supervised release following imprisonment. As a special condition of supervised release, the government requests that the Court require Roberson to perform 250 hours of community service in the North Birmingham community annually.

Respectfully submitted,

*/s/ George Martin*
GEORGE A. MARTIN, JR.
ROBIN B. MARK
JOHN B. WARD
Assistant United States Attorneys

# CERTIFICATE OF SERVICE

I certify that on October 17, 2018, I filed this document electronically with the United States District Court for the Northern District of Alabama using the CM/ECF system and thereby caused a copy to be served on the defendant's counsel of record.

*/s/ George Martin*

GEORGE A. MARTIN, JR.

Assistant United States Attorney